UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

KIMBRA MATTHEWS,

                Plaintiff,

-vs-                            Case No.  5:05-cv-344-Oc-10GRJ

VILLAGE CENTER COMMUNITY
DEVELOPMENT DISTRICT,

                Defendant.

_____

## O R D E R

This Florida Civil Rights Act and Family and Medical Leave Act case is before the Court for consideration of the Defendant Village Center Community Development District's Motion for Summary Judgment (Doc. 21).  The Plaintiff, Kimbra Matthews, contends that the Defendant failed to accommodate her alleged disability, terminated her because of that disability and for requesting an accommodation, interfered with her rights under the Family and Medical Leave Act, and retaliated against her for exercising her rights under the Act. The Plaintiff has filed a response (Doc. 26) to the Defendant's motion, and the Defendant, after receiving permission from the Court, has filed a reply brief as well (Doc. 31).

Having considered the arguments of both parties, the Court concludes that the motion for summary judgment is due to be granted as to all claims except for the Plaintiff's interference claim under the Family and Medical Leave Act.

**BACKGROUND**

The following recitation of the material facts is viewed in the light most favorable to the Plaintiff.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

I.      The Parties.

The Plaintiff, Kimbra Matthews, is a 43 year old resident of Weirsdale, Florida. Matthews has suffered from a permanent and degenerative eye disorder, keratoconus, since she was a young girl.  The disease affects both of her eyes and its primary symptoms are blurry vision when viewing distances.  Matthews' condition grew progressively worse over the years, but she has successfully treated her symptoms with glasses, soft contacts, hard contacts, and speciality contacts in which two contacts are used in each eye.  Despite her condition, Matthews has consistently been able to perform her daily activities, including her ability to work.  In fact, Matthews does not contend that her major life activities have been affected in any way, other than her present claim that she cannot perform certain job duties for the Defendant.

The Defendant, Village Center Community Development District ("Village Center") is a public, non-profit unit of local government that was created and operates pursuant to the Uniform Community Development District Act of 1980, Fla. Stat. Chap. 190.  Village Center was founded in 1992 and provides contractual infrastructure services to residents of the Villages north of Count Road 466.  The services currently provided are park and recreation services and maintenance, executive golf course maintenance, neighborhood

watch services, the Little Sumter utilities service area, the Village Center utilities service area, and public safety maintenance.

Village Center is governed by a five-member Board of Directors who are elected in accordance with Florida law. See Fla. Stat. § 190.006. The daily operations are managed by Pete Wahl, District Manager. During the relevant time period, Wahl supervised the Finance Department. The Chief Financial Officer for the Finance Department, and Matthews' direct supervisor, was Melinda Short.

The Village Center promulgated and maintained the Village Center Community Development Personnel Policies and Procedures, which existed during Matthews' employment, and governed the terms and conditions of her employment. The Policies and Procedures addressed virtually all aspects of employment at Village Center. With respect to the issues in this case, the Policies and Procedures prohibited all forms of discrimination in employment with respect to any protected classification, and provided that "[e]very effort will be made to employ and retain handicapped persons, in any position for which they are qualified."[1]

Village Center also has created a Code of Conduct and Disciplinary Action policy, which is included in its Policies and Procedures manual.[2] Village Center utilizes a progressive discipline policy, beginning with verbal warnings for the most minor violations,

---

[1]See Village Center Community Development District Personnel Policies and Procedures, § 2.01 (Doc. 21-3).

[2]Id., §§ 17.01 - 17.05.

up to suspension and dismissal for more serious infractions.   The policy also lists numerous offenses which may result in immediate dismissal.   Such offenses include "deliberately misusing, destroying or damaging any District property or property of another employee," and "theft or removal from District location without proper authorization of any District property or property of another District employee."[3]

II.     Matthews' Employment With Village Center

Matthews worked for The Villages of Lake-Sumter, Inc., an entity related to Village Center from 1996 until early 2001.  On January 22, 2001, Matthews applied for the position of Senior Accountant with Village Center's Finance Department.  In addition to submitting a job application, Matthews interviewed with Pete Wahl and Melinda Short.  During her interview, Matthews disclosed that she suffered from keratoconus and that she would need time off to attend doctor's appointments to treat her condition.  She also explained that she would eventually require eye surgery, which would necessitate a more extended leave of absence.  Wahl and Short both made clear to Matthews that they would work with her to accommodate her doctor's visits and surgery.  They gave no indication that Matthews' condition would be a problem.

_____

[3]Id., § 17.04.03.  The version of the Policies and Procedures manual submitted to the Court is dated "May 8, 1996, Revised "DRAFT" October 2004."  Matthews contends that she never received a copy of this manual, and it appears that this version of the manual was not provided to employees until after Matthews' termination.  See Deposition of Kimbra Matthews ("Matthews Dep."), pp.  71-73; Deposition of Peter Wahl ("Wahl Dep."), pp.  14-15.  However, Matthews admits that she was at least aware of Village Center's disciplinary policy, and specifically, that destruction of company property could be grounds for immediate dismissal.  Matthews Dep., pp. 210-12.

Matthews began her employment with Village Center in the position of Senior Accountant in February 2001.  Her job duties included maintaining and producing balance sheet reports, reviewing the general ledger for missed classifications, facilitating financial audits, producing other financial statements on a monthly basis, and assisting accounting personnel as needed.[4]  One very important job function was to safeguard the integrity of the Village Center's budget and general ledger and to keep track of the sources of Village Center's funding and expenses.[5]  Failure to perform these functions on a timely basis would result in violations of Generally Accepted Accounting Principles, which Village Center was required to follow.[6]  Matthews also was responsible for preparing the Finance Department for periodic audits.  During the time leading up to such audits, Matthews would routinely work more than 40 hours per week.[7]

During her first year of employment, Matthews' keratoconus  worsened, forcing her to switch from hard contact lenses to two specialty contact lenses in each eye.  Despite this change in her condition, Matthews was able to continuously and satisfactorily perform her job duties.[8]  During this same time period, Matthews requested and received a larger

---

[4]See Deposition of Kimbra Matthews ("Matthews Dep."), pp.  52-53.

[5]Id., p.  59.

[6]Id., pp.  59-60.

[7]Id., pp.  64-65.

[8]Id., p.  81.

computer monitor, which helped Matthews' better view computer documents.[9]  Other than the larger computer monitor, Matthews made no further requests for accommodations until she returned from her eye surgery.[10]

Matthews continued to perform all her job duties successfully until April, 2004, at which point she began to experience greater complications associated with her keratoconus, including more frequent eye infections and abrasions.[11]  Matthews provided a doctor's note to Short and Frank Pfeifenroth, stating that she was scheduled for eye surgery on April 19, 2004.[12]  Matthews also informed Short and Pfeifenroth that she would require at least one month of leave in order to recuperate, and that her healing process could continue for upwards of a year thereafter.  Matthews underwent  corneal transplant surgery on her left eye on April 19, 2004 and remained on leave until May 3, 2004.  Village Center paid Matthews her full salary during this entire time.[13]

On April 27, 2004 Matthews presented documentation from Dr.  Keith Charles, her treating physician and surgeon, to Pfeifenroth concerning the status of her recovery.  Dr.

---

[9]Village Center eventually gave larger computer monitors to several other employees in order to aid them in performing various computer imaging work.

[10]Although Matthews did not make an official request, Village Center permitted her to take longer breaks than other employees when her eyes became strained or tired.  <u>See</u> Sworn Statement of Melinda Short ("Short Stmt."), p.  7.

[11]Matthews Dep., pp.  92-93.

[12]<u>See</u> Preoperative Instructions Form, dated March 23, 2004, attached as Exhibit 6 to Defendants' Motion for Summary Judgment.

[13]Matthews Dep., pp.  116-17.

Charles explained that Matthews could return to work on May 3, 2004, but was limited to a half-day schedule until further notice.[14]  Village Center permitted Matthews to work four hour days for the next two and one-half weeks, while paying her full salary.  During this time, Matthews told Short that she expected her half-day schedule to continue at least through the end of July.

III.   Matthews' Request for Family Medical Leave

On May 20, 2004 Pfeifenroth sent Matthews a letter asking her to provide an update from her treating physician specifying her prognosis, confirming the length of the anticipated work restriction, and the reasons for the restriction.  Pfeifenroth requested that Matthews submit the update by June 4, 2004.[15]  In response, Matthews contacted a lawyer who suggested that she file a request for leave under the Family and Medical Leave Act ("FMLA").  She did so on May 20, 2004, requesting that she be permitted to work half days until September 30, 2004 due to her surgery.[16]  That same day, Matthews also submitted a doctor's note from Dr.  Charles stating that she could not return to work until May 24,

---

[14]See Handwritten Note from Mid-Florida Eye Center, dated April 27, 2004, attached as Exhibit 7 to Defendant's Motion for Summary Judgment.

[15]See Letter from Frank Pfeifenroth to Kimbra Matthews, dated May 20, 2004, attached as Exhibit 9 to Defendant's Motion for Summary Judgment.

[16]See Employee's Request for Family or Medical Leave, dated May 20, 2004, attached as Exhibit 8 to Defendant's Motion for Summary Judgment.

2004.[17]   Matthews did not, however, return to work until June 1, 2004 pursuant to a previously scheduled vacation.

When Matthews returned to work on June 1, 2004, she responded to Pfeifenroth's earlier request and provided Village Center with a letter from Dr. Charles discussing her current condition and treatment.[18]   The letter stated that Matthews was "doing very well postoperatively," and that Dr. Charles anticipated Matthews' visual acuity to continue to improve over the year with "an excellent visual outcome."   With respect to the length of Matthew's work restrictions, Dr. Charles recommended that for at least one month following surgery, Matthews avoid dusty environments and situations where she could be struck or poked in the eye. Dr. Charles stated that "[u]tilization of the eye for computer work or other visual tasks will in no way harm the eye or affect the prognosis. However, patients having undergone corneal transplant surgery will often have eye strain if they use the eyes for near work for prolonged periods of time."   Dr. Charles concluded that "[t]here is no reason to limit Ms. Matthews' work activities. That is utilizing the eye will in no way damage the eye. However, she may experience eye strain and for this reason it is difficult to determine the length of her work restrictions. Especially [sic] she will have to increase her work duration on an as tolerated basis."

---

[17]See Letter from Cataract & Laser Institute, dated May 20, 2004, attached as Exhibit 10 to Defendant's Motion for Summary Judgment.

[18]See Letter from Dr. Keith C. Charles, M.D. to Kimbra Matthews, dated June 1, 2004, attached as Exhibit 12 to Defendant's Motion for Summary Judgment.

Pursuant to a request from Matthews, Dr. Charles further expanded on his prognosis in a letter dated June 2, 2004.[19]  In this letter, Dr. Charles noted that Matthews' current visual acuity was 20/30 in the right eye and 20/200 in the left eye.  He also explained that Matthews continued to wear contact lenses in her right eye and that if she developed an infection in that eye, she would have to discontinue contact lens wear.  This would result in a drop in visual acuity to a level that would not permit her to drive a car.  Dr. Charles further explained that if she performed near work for prolonged periods, both eyes would suffer strain, which could manifest with headaches or blurred vision.  The letter did not limit Matthews to a half-day work schedule, nor did it state that Matthews currently suffered from any infections or eye strain.

Upon receipt of these two letters, Pfeifenroth contacted Dr. Charles by telephone to ask whether Matthews should still work half-days, or had any other work restrictions.  Dr. Charles stated that while Matthews had some irritation that was expected to last for some time, she did not qualify for FMLA leave and had no work restrictions.  Specifically, Dr. Charles noted that working with a computer as Matthews does, did not require any adjustments to her schedule.  Pursuant to this information, Pfeifenroth denied Matthews' request for FMLA leave.[20]

---

[19]See Letter from Dr. Keith C. Charles, M.D. to Kimbra Matthews, dated June 2, 2004, attached as Exhibit 13 to Defendant's Motion for Summary Judgment.

[20]Matthews contends that when this first request for leave was denied, she was told by Pfeifenroth that it was because he did not really know how the FMLA worked.

On June 9, 2004, Matthews submitted a second request for part-time FMLA leave.[21] This time, she identified a new physician, Jack Yager, D.O. as her treating physician. Although Dr. Yager did not perform Matthews' surgery, he had been treating her keratoconus for several years and continued to treat her following surgery.[22]  Matthews also submitted a letter from Dr. Yager describing the nature and symptoms of keratoconus,[23] and a Certification of Physician or Practitioner signed by Dr. Yager.  The Certification indicated that Matthews' condition qualified as a "serious health condition" under the FMLA, and would require constant care.[24]  The Certification further stated that Matthews should work only four to four and one-half hour days until September.

Dr. Yager also wrote to Pfeifenroth directly, stating that while Matthews does wear contact lenses in her right eye, such wear should be kept to a minimum until her corneal transplant is healed and can be fitted with a contact lens as well.  At that time, Dr. Yager opined Matthews could return to work full-time.  He then suggested that Matthews work only four and one-half hours per day until August when he would re-evaluate her

---

[21]See Employee's Request for Family or Medical Leave, dated June 9, 2004, attached as Exhibit 16 to Defendant's Motion for Summary Judgment.

[22]Matthews Dep., pp. 93-95, 97-98.

[23]See Undated Letter from Dr. Yager, attached as Exhibit 18 to Defendant's Motion for Summary Judgment.

[24]See Certification of Physician or Practitioner dated June 10, 2004, attached as Exhibit 17 to Defendant's Motion for Summary Judgment.

condition.[25]   Based on this documentation, Village Center granted Matthews' FMLA request.  However, instead of granting Matthews' request to work part-time, Village Center required Matthews to take twelve weeks of unpaid leave, until September 6, 2004.[26]

On June 11, 2004, Matthews met with Wahl and Pfeifenroth to discuss her FMLA leave request.  During the conversation, Wahl stated that she would be permitted to return to work in her same position at the completion of her leave "because they were required to by law."[27]  Wahl further explained that they could not permit Matthews to work part-time because Village Center needed a full-time Senior Accountant at work every day.

Village Center determined that it could not permit Matthews to work part-time because as Senior Accountant, several of Matthews' job duties were time sensitive. Matthews prepared numerous financial statements and reports on a monthly basis, and Village Center was afraid she would fall behind on these and other job duties if she only worked part-time.  For example, the Board of Directors relied on the financial information Matthews helped generate in order to make decisions about Village Center operations, and

---

[25]See Letter from Dr.  Jack J.  Yager to Frank Pfeifenroth, dated June 10, 2004, attached as Exhibit 19 to Defendant's Motion for Summary Judgment.

[26]See Employer's Response to Employee Request for Family or Medical Leave, dated June 10, 2004, attached as Exhibit 20 to Defendant's Motion for Summary Judgment.

[27]Matthews Dep., pp.  187-88.

11

if they did not receive this information on time, such decisions could be delayed to Village Center's detriment.[28]

Although Matthews admitted at deposition that she at times was required to work in excess of 40 hours per week, she stated that she was nevertheless able to complete all of her job duties within 20 hours per week.[29]  However, between May 3, 2004 and June 10, 2004, Matthews began to fall behind on her job duties, and was not completing her financial statements on a timely basis.[30]  At the same time, other employees in the Finance Department, including Short, were experiencing an increase in their workload due to Matthews' part-time schedule.[31]  As a result, Short was worried that without a full-time Senior Accountant, the Department would not be able to complete all necessary financial documents in time for the upcoming October audit.[32]

Village Center also could not hire a temporary part-time accountant to cover Matthews' absences because there were no funds available from the Finance Department's budget.  The Finance Department's budget authorized only one Senior Accountant position.  Because Matthews was an exempt, salaried professional, Village Center believed it was required to pay her entire full-time salary regardless of the number

---

[28]Matthews Dep., pp.  63-64.

[29]Id., pp.  66-67, 124-25.

[30]Wahl Dep., pp.  48-49.

[31]See Short Stmt., p.  11.

[32]Id., pp.  13-14

of hours she worked each week.  As a result, there were no excess funds available for additional personnel.[33]  In addition, Matthews' job duties were so specific that they could not be performed by the Finance Department's other accountant.  Because the Finance Department could not hire another accountant, and would not be able to complete their required financial statements without a full-time accountant, Short asked Wahl to place Matthews on full-time unpaid leave so the budget would be freed up to obtain the services of another full-time accountant.[34]

IV.    Termination of Matthews' Employment

While Matthews worked at Village Center, all employees were required to save their computer files on a network server, rather than the employee's own computer.[35]  All files on the network server were regularly backed-up on electronic files.[36]  The network server was divided in numerous folders, with varying degrees of user accessibility.  Matthews had access to three folders: a personal folder, the Finance Department folder, and the public folder.  Matthews folder was accessible only by her and was secured by a password of her choosing.  The Finance Department Folder was accessible only by members of the

---

[33]In fact, the Finance Department has never used part-time employees to fill accountant positions.  Matthews Dep., p.  195.

[34]Short Stmt., pp.  14-15.  While on FMLA leave, Matthews wrote to Pfeifenroth on July 30, 2004 to request that she be allowed to return to work on a part-time basis.  Matthews Dep., p. 196.  It does not appear that Pfeifenroth ever responded to Matthews' letter.

[35]See Deposition of Dale Borrowman ("Borrowman Dep."), p.  9.

[36]Id.

13

Finance Department.  The public folder was accessible by all employees and was not password-protected.  Destruction or deletion of any files on the network is considered destruction of company property and is grounds for immediate dismissal.

Matthews kept her work files on her personal, password-protected folder.  There is no dispute that such files were the property of Village Center only.  Prior to leaving for her 12 weeks of FMLA leave, Matthews transferred almost all of her work files - totaling 570 files and 51 sub-folders - to the public folder, under a sub-folder labeled "CDC FILE."  Once placed on the public folder, her files, which contained annual reports, assessments, audits, and other types of confidential financial information, could be accessed and altered by any other employee, including persons outside of the Finance Department who were not otherwise authorized to access such files.

Matthews did not inform anyone at Village Center of her actions, and admitted at deposition that the description of the sub-folder was not informative enough to give anyone a hint at where the files could be located.[37]  She also did not give anyone her password to her personal folder so her files could be accessed while she was out.  While on her 12-week FMLA leave, Matthews did not call Short or anyone else at Village Center to tell them

---

[37]Matthews Dep., 225-26.  At deposition, Matthews testified that she tried to tell Short that she had transferred her files.  However, what Matthews really did was simply tell Short as they passed each other in the hallway that she needed to talk with Short.  Matthews also told Pfeifenroth that she wanted to talk to Short.  Matthews never explained the subject of what she wanted to discuss with Short, and made no further attempts to tell Short or anyone else at Village Center what she had done.  Id., p.  226.

where they could find her files.[38]  At the time she transferred these files, Matthews was aware of Village Centers' disciplinary policy, particularly that intentionally deleting files was grounds for immediate termination.

Once Matthews began her FMLA leave, Short attempted to locate the files from Matthews' personal folder.  Short first contacted Human Resources, and learned that Matthews had not disclosed her password.  Short then contacted the Information Systems Department, informed them that Matthews was on extended medical leave, and asked them to access Matthews' personal folder and transfer all files to Short's personal folder.  When Information Systems completed the request, Short found only a few files relating to Matthews' dogs, a few personal letters, and other non-business related items.  None of the work-related files routinely generated and maintained by Matthews were found.[39]

---

[38]Matthews has submitted an affidavit attached to her opposition brief, in which she states, for the first time, that she did notify in advance both Short and another, unnamed co-worker at Village Center, about her transfer of the files.  This last-minute affidavit directly contradicts Matthews' own prior deposition testimony and therefore cannot be used to create a material issue of fact to defeat summary judgment.  See Van T. Junkins & Assocs., Inc. v. U.S. Industries, Inc., 736 F.2d 656, 657-68 (11th Cir. 1984); Musarra v. Vineyards Development Corp., 343 F.Supp.2d 1116, 1121 (M.D. Fla. 2004).  In addition, Village Center has submitted an affidavit from Mary Gerwer, the co-worker Matthews apparently spoke with.  See Affidavit of Mary Gerwer ("Gerwer Aff."), (Doc. 32).  Although Gerwer confirms that Matthews told her about the transferred files, at the time of the discussion, Gerwer was no longer employed by Village Center.  Gerwer Aff., ¶ 2-4.  Gerwer was instead merely Matthews' friend and neighbor.  The Court fails to see how confiding in a friend who has no contact with Village Center can excuse Matthews' actions.  Moreover, Gerwer avers that she urged Matthews to return all of the files to her personal folder, but that Matthews refused, stating that by transferring the files, Village Center would "need her."  Id., ¶¶ 5-6.

[39]Short Stmt., pp.  16-17.

15

Because Short did not realize what Matthews had done with her work-related files, Short asked Information Systems to try and recover the files from the back-up electronic network tapes.  The majority of Matthews' files were recovered in this manner, however, Short was forced to spend several days reviewing each file to ensure that they were up to date and accurate.[40]  Short reported the missing files to Wahl and Pfeifenroth and the incident was documented in Matthews' personnel file.

Following this incident, Dale Borrowman, the Director of Information Systems, submitted a notarized affidavit to Village Center stating that, in his opinion, Matthews had purposely deleted all 570 files and 51 sub-folders from her personal folder.[41]  Borrowman formed this opinion based on his knowledge of the computer system.  If Matthews had simply transferred the files, he would have been able to track them to their current location.[42]  Because he was not able to track them, Borrowman concluded that they had to have been deleted.

Matthews returned from her FMLA leave on September 7, 2004.  On that day, she met with Wahl, who provided her a letter stating his intent to terminate her employment for destruction of company property.[43]  Wahl then gave Matthews a chance to explain her

---

[40]Short Stmt., pp.  18-19.

[41]See Affidavit of Dale Borrowman dated August 2, 2004.  (Doc.  21-5).

[42]Borrowman Dep., p.  17.

[43]See Letter from Peter F.  Wahl to Kimbra Matthews, dated September 7, 2004, attached as Exhibit 25 to Defendant's Motion for Summary Judgment.  The letter also stated that prior to
(continued...)

behavior.  At that time, and for the very first time, Matthews explained that she did not

delete any files, but instead had transferred them to the public folder.  She claimed to have

done this so that the files would be accessible without having to provide her password.

However, Matthews admitted that she did not tell anyone what she had done and did not

obtain prior permission for her actions.  As a result, Village Center terminated her

employment effective immediately.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment

is appropriate only when the Court is satisfied that "there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."  In

applying this standard, the Court must examine the pleadings, depositions, answers to

interrogatories, and admissions on file, together with any affidavits and other evidence in

the record "in the light most favorable to the nonmoving party."  Samples on Behalf of

Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in

Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of

establishing the nonexistence of a triable issue of fact.  If the movant is successful on this

score, the burden of production shifts to the non-moving party who must then come forward

with "sufficient evidence of every element that he or she must prove."  Rollins v.

---

[43](...continued)
taking leave, Matthews repeatedly contacted persons outside of the Finance Department and
Village Center to see if they would intervene on her behalf with respect to her prior requests for
FMLA leave, and that such communications violated company policy.

Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

### Discussion

I.    Matthews' Florida Civil Rights Act Claims

The Florida Civil Rights Act ("FCRA") prohibits discrimination on the basis of handicap or disability in the workplace. See Fla. Stat. § 760.11. Disability discrimination claims such as those brought by Matthews are analyzed using the same standards as claims brought under the Americans With Disabilities Act ("ADA"), and, where there is no direct evidence of discrimination,[44] apply the burden-shifting analysis set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See Chanda v. Engelhard/ICC, 234 F.3d 1219, 1221 (11th Cir. 2000); Downing v. United Parcel Service, Inc., 215 F. Supp.2d 1303, 1308-09 (M.D. Fla. 2002); see also Smith v. Avatar Properties, Inc., 714 So.2d 1103, 1106-07 (Fla. 4th DCA 1998). Matthews alleges three separate theories of liability under the FCRA: (1) disparate treatment; (2) retaliation; and (3) failure to accommodate. The Court will address each claim separately.

### A.    Disparate Treatment Discrimination Claim

To advance her disparate treatment claim under the FCRA, Matthews must first establish a prima facie case of discrimination by showing that: (1) she has a disability; (2)

---

[44]The Parties do not contend that there is any direct evidence of discrimination against Matthews.

she is a "qualified individual with a disability;" and (3) Village Center unlawfully discriminated against her because of her disability - *i.e.* Village Center terminated her while not terminating non-disabled employees who engaged in similar conduct.  Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1215 (11th Cir. 2004); Hilburn v.  Muarata Electronics N.A., Inc., 181 F.3d 1220, 1226 (11th Cir.  1999).  If Matthews is able to establish her prima facie case, the burden then shifts to Village Center to come forward with a legitimate, nondiscriminatory reason for her termination.  If Village Center establishes such a reason, Matthews must then prove by a preponderance of the evidence that the proffered reasons are pretextual.  See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981); Earl v.  Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir.  2000).

Village Center seeks summary judgment by arguing that Matthews cannot establish the first element of her prima facie case - that she suffers from a disability.  Village Center also contends that it terminated Matthews' employment for legitimate, nondiscriminatory reasons.  The Court agrees on both points.

> 1. *Actual Disability.*

Village Center argues that Matthews cannot establish a claim under the FCRA because she does not suffer from a disability.  In order to satisfy this portion of her prima facie case, Matthews must satisfy the definition of "disability" in the ADA:  (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such impairment; or (3) being regarded as having such impairment.  42 U.S.C. § 12101(2).

19

An individual is deemed to be "disabled" for purposes of the ADA if she satisfies any one of these three enumerated definitions.  See 29 C.F.R. § 1630.2(g).

Matthews contends that she has satisfied all three definitions of "disability," or at least created sufficient material issues of fact to avoid summary judgment.  In order to establish that she suffers from an "actual disability," Matthews must prove: (1) that she suffers from a recognized physical or mental impairment; (2) that one or more of her "major life activities" are affected by the impairment; and (3) that the impairment "substantially limits" one or more of these activities.  Bragdon v. Abbott, 524 U.S. 624, 631-41 (1998); Rossbach v. City of Miami, 371 F.3d 1354, 1357 (11th Cir. 2004).  The first two elements are determined by the Court as a matter of law.  See Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1129 (10th Cir. 2003).  Determining whether the impairment substantially limits a major life activity is ordinarily a question of fact for the jury; however, summary judgment is appropriate if Matthews fails to create a genuine issue of fact in this regard.

The first element of actual disability - that Matthews suffers from a recognized impairment - is met in this case.  The parties do not dispute that Matthews suffers from an degenerative eye disease and that this condition qualifies as a physical impairment for purposes of the ADA and FCRA.  However, a physical impairment, standing alone, does not necessarily make one actually disabled.  Hilburn, 181 F.3d at 1226; Pritchard v. Southern Company Services, 92 F.3d 1130, 1132 (11th Cir.  1996).  Rather, the impairment must substantially limit one or more of the individual's major life activities.

Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 725-26 (5th Cir. 1995). See also Swain v. Hillsborough County School Bd., 146 F.3d 855, 858 (11th Cir. 1998) (a plaintiff "must provide some evidence beyond the mere existence and impact of a physical impairment to survive summary judgment.").

To establish the second element of the definition of actual disability, Matthews must identify the major life activities affected by her impairment. As the Supreme Court explained, "'[m]ajor' in the phrase 'major life activities' means important. 'Major life activities' thus refers to those activities that are of central importance to daily life." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002). Major life activities are enumerated under the ADA as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). If not contained within these exemplars, the activity must be of "central importance" or "significant" to daily life. Toyota Motor Manuf., 534 U.S. at 197; Bragdon, 524 U.S. at 638; Rossbach, 371 F.3d at 1357. In this case, Matthews maintains that her keratoconus affects a single major life activity - her ability to work.[45]

Having identified the major life activity affected by her keratoconus, Matthews must next produce evidence sufficient to create a genuine issue of fact with respect to whether her illness "substantially limited" her ability to work. The ADA does not define what it means for a major life activity to be "substantially limited." However, with respect to the

---

[45]See Plaintiffs' Response in Opposition, p. 8-10 (Doc. 26). Village Center does not dispute that working constitutes a major life activity.

major life activity of working, the EEOC has explained that a plaintiff must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."   29 C.F.R. § 1630.2(j)(3)(i).   In other words, to be regarded as substantially limited in the major life activity of working, "one must be regarded as precluded from more than a particular job." Murphy v. United Parcel Service, Inc., 527 U.S. 516, 523 (1999); see also Sutton v. United Airlines, Inc., 527 U.S. 471, 491 (1999) ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs.").

Whether an individual is substantially limited in a major life activity is to be determined on a case-by-case basis.   Sutton, 527 U.S. at 483 ("[W]hether a person has a disability under the ADA is an individualized inquiry."). This individualized determination should be made with reference to "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2); Sutton, 185 F.3d at 1208-09. Furthermore, "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures - both positive and negative - must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." Sutton, 527 U.S. at 482.  In other words, Matthews must present evidence that even with

22

her corrective lenses in her right eye and the results of her surgery in her left eye that she presently remains significantly restricted in her ability to perform the major life activity of working when compared to the average person in the population.  See 29 C.F.R. § 1630.2(j)(1); Sutton, 527 U.S. at 482-83.   Matthews has not done so.

As evidence of the substantial limitations imposed by her keratoconus, Matthews relies on her deposition testimony, her subsequent affidavit, and the documentation from her second treating physician, Dr. Yager.  However, none of this evidence establishes that Matthews was limited at all, much less substantially limited.  At most, they establish that Matthews could only work her specific job, which required, in part, viewing documents on a computer monitor, for four hours per day, and that this limitation would only last for approximately three months.[46]  None of this evidence is sufficient to create a genuine issue of fact as to whether Matthews was substantially limited in performing a broad range of jobs when compared with the average person.  In fact, Matthews has never even claimed that she is unable to perform a broad class of jobs - it seems that her entire argument rests simply on the fact that she has keratoconus and that, as a result, she occasionally suffers eye strain and blurry vision.  This is simply not enough.[47]

---

[46]The credibility of Dr.  Yager's medical opinions is also in question, as they directly contradict those of Matthews' other treating physician, Dr.  Charles, who actually performed Matthews' surgery.  While such credibility determinations are normally left for the trier of fact, they need not be reached in order to render summary judgment in favor of Village Center on this claim.

[47]Indeed, since her termination from Village Center, Matthews has performed a variety of jobs, including working full-time at Jackson Hewitt Tax Service as a tax preparer, self-employment as a bookkeeper/accountant, and full-time employment as a sub-contractor for Builder's Direct
(continued...)

To the contrary, Matthews has presented evidence that she was not substantially limited in any manner.  She repeatedly stated throughout her deposition that she was able to satisfactorily perform all of her job duties as Senior Accountant while only working 20 hours per week.[48]  Thus, not only has Matthews failed to prove that she is substantially limited from performing an entire class of jobs, but she has also failed to prove that she was substantially limited from performing her own job.

Matthews also cannot establish that she suffers from an actual disability because the effects of her eye condition are temporary and transitory.  Matthews testified that she has been able to control the effects of her keratoconus through various aides, including eyeglasses and contact lenses, and that she was able to perform all of her job responsibilities at Village Center up to her date of surgery.[49]  She further testified that since her surgery, her eyesight has vastly improved, and that she is able to function fully, even without yet having surgery on her right eye.[50]  In fact, following surgery, her eyesight in her right eye improved to 20/30 and continued to improve such that for the past two years Matthews has not needed any type of corrective lens on her right eye.  Matthews also

---

[47](...continued)
Carpet and Tile.  Matthews Dep., pp.  231-237.

[48]Matthews Dep., pp.  66-67, 124-25.

[49]Id., pp.  78-81.

[50]Id., pp.  41, 46, 76.

24

intends to have surgery on her left eye at some point in the future, which will most likely allow her to see clearly without any visual aides at all.[51]

Matthews' requested accommodation, working half-days for a period of three months in order to avoid eye strain from staring closely at a computer monitor, further demonstrates the temporary and correctable nature of her condition.  Both of Matthews' physicians agreed that any eye strain would lessen over time, and that she was expected to make a full recovery.  Matthews herself testified to the vast improvement in her visual acuity since her surgery.  In fact, the only reason given by Dr. Yager for the requested part-time schedule was to avoid the possibility of eye infections.  Matthews has simply not presented any evidence that her keratoconus would permanently and significantly impact her ability to work.[52]

Rather, the uncontroverted evidence shows that the identified limitation experienced from Matthews' keratoconus is and continues to be adequately controlled by her corrective lenses and surgery, and lacks sufficient severity and permanence to constitute a substantial limitation on the major life activity of working.  See Sutton, 527 U.S. at 488.

---

[51]Matthews has also not claimed, or provided any evidence, that even with her corrective aides, she is substantially limited from working when compared to the average person.

[52]See, e.g., 29 C.F.R. Pt. 1630, App.§ 1630.2(j) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"); see also Toyota Mfg., 534 U.S. at 198 (stating "[t]he impairment's impact must also be permanent or long term"); Sutton v. Lader,185 F.3d 1203, 1209 (11th Cir.1999) (noting under the Rehabilitation Act that a temporary condition does not constitute a "disability").  Cf.  Colwell v. Suffolk County Police Department, 158 F.3d 635, 639-41 (2nd Cir.1998) (cerebral hemorrhage which required hospitalization for 30 days, home care for six months, and restrictions from strenuous physical labor for several years, was not substantial limitation in ability to work to qualify as a disability).

Accordingly, Matthews has failed to create a triable issue of fact as to wether she was actually disabled within the meaning of the FCRA.

> 2.    *Record of Impairment.*

Matthews also claims that she is disabled because she has a "record of an impairment."  An individual with a "record of an impairment" that substantially limits a major life activity is also considered to be an individual with a disability under the EEOC regulations.  See 29 C.F.R. § 1630.2(k).   In order to base a discrimination claim on this definition, Matthews' proffered record of impairment must show that her impairment substantially limited her in one or more major life activities. See Chanda v. Engelhard, 234 F.3d 1219, 1224 n. 33 (11th Cir.  2000); Hilburn, 181 F.3d at 1229.

Matthews broadly argues that her "record of an impairment" is established "by the fact that she communicated most, if not all, of the pertinent details regarding her condition [to Village Center] right from the onset of her employment," and provided documentation from her physician regarding her surgery and condition.[53]  This is not enough.  As already noted, Matthews has not produced any evidence that her impairment substantially limits her major life activity of working; this includes all information - either oral or in writing - that Matthews provided to Village Center throughout her employment.  If anything, her records demonstrate that she was temporarily limited in the number of hours she was able to work one specific job.  Accordingly, Matthews has failed to establish that she has a "record of

---

[53]Opposition, p. 10-11.

impairment" that substantially impacted a major life activity, and cannot satisfy this definition of "disability" for purposes of her <u>prima facie</u> case.  <u>See</u> <u>Albright v. Columbia County Bd. Of Educ.</u>, 135 Fed. Appx. 344, * 2 (11th Cir. 2005) ("The law is clear that 'the record-of-impairment standard is satisfied only if she actually suffered a[n] impairment that substantially limited one or more of her major life activities.'") (quoting <u>Hilburn</u>, 181 F.3d at 1229).

### 3.    *Regarded As Impaired.*

The third way to prove disability within the meaning of the FCRA is to show that Matthews was "regarded as" having an impairment that substantially limits one or more major life activities.  <u>See</u> 29 C.F.R. § 1630.2(1).  In this case, Matthews must prove that she is an individual who "(1) has a physical or mental impairment that does not substantially limit major life activities but is treated by her employer as constituting such limitation, or (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment."  <u>Hilburn v. Murata Electronics of North America, Inc.</u>, 17 F.Supp.2d 1377, 1382 (N.D. Ga. 1998); <u>Sutton</u>, 527 U.S. at 489.

"The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled."  <u>Sutton v. Lader</u>,185 F.3d 1203, 1209 (11th Cir.1999) (Rehabilitation Act).  The plaintiff must show not only that her employer perceived her as unable to perform the relevant  "class of jobs," but that she is also unable to perform other jobs in the area that utilized  "similar training,

knowledge, skills or abilities." <u>Witter v. Delta Air Lines, Inc.</u>, 138 F.3d 1366, 1370 (11th Cir.1998).

On this record, there is no genuine issue of fact that Matthews' supervisors viewed her as incapable of, or substantially limited in, performing her job because of her keratoconus.  On the contrary, the evidence shows that Village Center believed Matthews was fully capable of performing her job, and wanted her to return to work in a full-time capacity as soon as possible.  Up to the date of her surgery, there is no evidence that Matthews was treated any differently than any other employee, and there is no record of any negative performance evaluations or other circumstances indicating that anyone perceived that Matthews could not perform her job duties.

In sum, Matthews' impairment does not fall within any of the pertinent legal definitions of disability.  The Court concludes that she has failed to provide sufficient evidence and authority to create a genuine issue of fact concerning this essential element of her <u>prima facie</u> case.

> ### 4.   Matthews' Termination Was Based on Legitimate Non-Discriminatory Reasons and Was Not Pretextual

Even if Matthews could establish a <u>prima facie</u> case of discrimination, the Court finds no genuine issue of fact in the evidence that Village Center had legitimate, non-discriminatory reasons for terminating her and that they were not pretextual.  Village Center terminated Matthews because she destroyed company property, namely the unauthorized

removal of 570 files and 51 sub-folders from her computer.  There is no dispute that such actions violated company policy, and were grounds for immediate termination.

Matthews has not presented any evidence to refute this fact.  First, she has presented no circumstantial evidence of discrimination, such as discriminatory remarks or comments concerning her eye condition.  Instead, she admits that Village Center agreed to bring her back to work following her FMLA leave, because they were required to by law.

Matthews also has not pointed to any similarly situated comparators.  Although she has claimed that other non-impaired employees who engaged in similar wrongdoing were not similarly disciplined, she has not identified any such employees.  Such broad and conclusory statements carry no weight and cannot establish discrimination or prevent summary judgment.  See Carter v.  City of Miami, 870 F.2d 578, 585 (11th Cir.  1989); Grigsby v.  Reynolds Metals Co., 821 F.2d 590, 597 (11th Cir.  1987).  Instead, Matthews has given a list of other employees who suffered various physical ailments and were given leaves of absence as requested.[54]  But this does not help her case.  Rather than establish any discriminatory animus towards Mathews or any other allegedly disabled employee, it tends to show a Village Center policy of accommodating all persons with disabilities.[55]

---

[54]See Matthews Dep., pp.  138-142.

[55]Although Matthews asserts in her Amended Complaint that her "requests for medical-based leave" were "unfairly and unequally addressed or complied with" as compared to non-handicapped employees, it appears that she has abandoned this claim as she makes no mention of it in her Response in Opposition.  Even if she has not abandoned this portion of her disability discrimination claim, the fact that Matthews cannot establish that she is disabled also dooms this claim. Moreover, Matthews has not presented any evidence of any non-disabled comparators who

(continued...)

In addition, Matthews' attempts to refute the veracity of Village Center's reasons for her termination fall flat.[56]  Matthews admitted at deposition that she <u>never</u> told anyone in advance at Village Center that she had moved the files or where she had placed them.[57] She  also admits that during her entire 12 weeks of FMLA leave, she never attempted to contact anyone at Village Center and explain where the missing files could be found.  Her contention that Village Center acted with a discriminatory animus because no one contacted her while she was on leave to find the missing files also has no weight.  It would be a strange rule indeed that requires a victim of wrongdoing to communicate with the wrongdoer as a showing of the victim's good faith before dealing with the loss or injury.

Matthews next attempts to create an issue of fact by debating whether her computer files were deleted or simply moved.[58]  This is a distinction without a difference.  Whether she transferred or deleted the files, the fact remains that Matthews intentionally removed

---

[55](...continued)
were treated any differently.  None of the persons listed by Matthews held similar positions or had job duties that were time sensitive in nature, and all but one of them suffered from physical ailments which required a reduced work schedule for a short period of time - just like Matthews.

[56]To show pretext, Matthews must come forward with evidence, "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1024 (11th Cir.  2000) (en banc) (internal quotations omitted).

[57]The Court will ignore Matthews subsequent affidavit, which is obviously intended to create a material issue of fact where none exists.  <u>See</u> <u>Van T.  Junkins & Assocs., Inc.  v.  U.S. Industries, Inc.</u>, 736 F.2d 656, 657-68 (11th Cir. 1984); <u>Musarra v.  Vineyards Development Corp.</u>, 343 F.Supp.2d 1116, 1121 (M.D. Fla.  2004).

[58]<u>See</u> Response in Opposition, pp.  5-6.

company property, without authority to do so, placed highly confidential information in a form that was readily accessible by all employees, and did not inform anyone of her actions.  While she may not have actually deleted the files and thrown them in the trash bin, by moving them to an unknown location and refusing to tell anyone, her actions had the same result.  In fact, the matter of the misplaced files could have been worse, as any employee could have accessed and altered key financial information.

The record before the Court clearly shows that Village Center had ample legitimate and non-discriminatory reasons for terminating Matthews' employment, and Matthews has not provided any evidence of pretext.  Accordingly, Village Center is entitled to summary judgment on Matthews' disparate treatment discrimination claim.  See Willis v Conopco, Inc., 108 F.3d 282, 287 (11th Cir.  1997) (finding summary judgment proper where ADA plaintiff failed to offer evidence to raise an inference that defendant's articulated explanation for her termination was pretext for discrimination).

### B.    Disability Retaliation Claim

Matthews second FCRA claim alleges that Village Center terminated her employment in retaliation for her request for a reasonable accommodation and/or because she complained of unequal workplace treatment on the basis of her disability.[59]  The ADA, and by incorporation, the FCRA, prohibits retaliation against or interference with a person who has asserted her rights under the ADA.  42 U.S.C. §§ 12203(a) and (b).  ADA

---

[59]See Amended Complaint, ¶¶ 44-45.  Matthews does not allege that the requirement that she take 12 weeks of full-time FMLA leave was retaliatory in nature.

retaliation claims are reviewed under the same standards as retaliation claims brought under Title VII of the Civil Rights Act, 42 U.S.C. §2000e, et seq.  See  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir.1997).

In order to establish a prima facie case of disability retaliation, Matthews must show: (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1328 (11th Cir. 1988).  If Matthews establishes a prima facie case, then Village Center has the burden of producing a legitimate non-retaliatory reason for the adverse employment decision.  Stewart, 117 F.3d at 1287.   If Village Center makes such a showing, Matthews must then prove that the proffered reason is mere pretext, and that the decision was made as retaliation for the protected activity.  Id.

The protected activity Matthews refers to in this claim is her requested accommodation for 12 weeks of part-time work schedule.[60]  At a minimum, Matthews has created a genuine issue of fact as to whether she had a reasonable belief that she was disabled and thus entitled to an accommodation.  See Roberts v. Rayonier, Inc., 135 Fed. Appx. 351 (11th Cir.  2005); Little v.  United Technologies, 103 F.3d 956 (11th Cir.  1997).

_____

[60]Amended Complaint, ¶ 44.  Matthews mentions in her Amended Complaint that she was also retaliated against for complaining of unequal workplace treatment on the basis of her handicap.  However, Matthews has not provided any evidence of any such complaints (other than her post-termination charge of discrimination) and the Court has been unable to locate any from the record presented.

Village Center does not challenge this point.  There is also no dispute that Matthews suffered an adverse employment action when her employment was terminated.  In addition, the short time period between Matthews' requested accommodation and her termination - she was fired the day she returned from her leave - also is sufficient to establish a causal link.  See Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1337 (11th Cir.  1999) (close temporal proximity between awareness of the protected activity and the adverse action sufficient to establish causal connection).

Having established her prima facie case of retaliation, the burden then shifts to Village Center to establish a legitimate non-retaliatory reason for terminating Matthews' employment.  Village Center has done so.  As previously discussed, Village Center terminated Matthews' employment because she deliberately destroyed (or moved to an undisclosed location) hundreds of company files which contained confidential financial information.  Matthews has not refuted this reason and has not produced any evidence of pretext.

Matthews does not address her retaliation claim in her opposition brief.  Thus, it can only be assumed that the same evidence she relied upon to establish pretext in her disparate treatment claim also applies to her retaliation claim.  Just as this information was insufficient to establish pretext in her discrimination claim, it falls short of establishing pretext on her retaliation claim.  Accordingly, summary judgment in favor of Village Center

is appropriate.[61]  See, e.g. Roberts v.  Design & Mfg.  Services, Inc., 167 Fed.  Appx.  82 (11th Cir.  2006) (where plaintiff did not show pretext in disability discrimination claim based on termination, plaintiff also did not show pretext in disability retaliation claim).

### C.   Failure to Accommodate Claim

Matthews' final FCRA claim centers on her request for part-time leave, which she contends was a reasonable accommodation for alleged disability.  According to Matthews, Village Center did not accommodate her request because she was forced to take full-time unpaid leave, instead of part-time paid leave.  This claim fails because Matthews has not proved that she has a disability.  See Kinsey v.  City of Jacksonville, 2006 WL 1827747 (11th Cir. Jul.  3, 2006).  This claim also fails because the accommodation Matthews requested was not reasonable.

Reasonable accommodations may include job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, and reassignment to another position.  42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o); Talavera v. Sch. Bd. of Palm Beach County, 129 F.3d 1214, 1217 (11th Cir.1997). However, "an employer is not required by the ADA to reallocate job duties in order to change the essential functions of a job."  Earl v. Mervyns, Inc., 207 F.3d 1361, 1367 (11th Cir.2000) (per curiam) (internal

---

[61]Matthews cites to the deposition of Frank Pfeifenroth throughout her Response in Opposition, but it does not appear that a copy of that deposition has been filed  with the Court. The Court does not believe that submission of this deposition is necessary, however, as even assuming that the references to Pfeifenroth's deposition are true, it does not create a genuine issue of material fact with respect to the question of pretext, or any other issue in this case.

quotations and citations omitted).

The Eleventh Circuit has previously held that not all part-time positions are reasonable accommodations.  For example, an employer is not required to create a part-time position where none exists, and may instead place a disabled employee on unpaid medical leave.  Terrell v.  U.S. Air, 132 F.3d 621, 624-26 (11th Cir.  1998)  (Where employer had no part-time positions available at time plaintiff demanded part-time schedule, a request for part-time employment was unreasonable).  But that is exactly what Matthews was requesting in this case.  There is no dispute that the Finance Department has never used part-time employees, and more particularly, has never hired part-time accountants.[62]  Thus, there was no part-time position Matthews could be transferred to, even temporarily.  It is also undisputed that the Finance Department's budget would not permit it to hire a part-time employee to assist Matthews while she was on part-time FMLA leave.  Thus, to allow Matthews to continue a part-time work schedule would have been an undue hardship on Village Center, particularly with the specter of a looming October audit on the horizon.  Matthews' requested accommodation, which was in essence a request for a special part-time position, was therefore not reasonable under the ADA and Eleventh Circuit precedent.  Terrell, 132 F.3d at 625-26.  See also Perkins v.  Alro Metals Service Center, Case No.  96-2371-CIV-T-17A, 1998 WL 182417, * 3 (M.D. Fla.  Mar.  13,

---

[62]See, e.g., Matthews Dep., pp.  191-95.

1998) (An employer is not required to reasonably accommodate sporadic or unpredictable absences or part-time work at the plaintiff's discretion).

Instead of this legally unreasonable accommodation, however, Village Center provided Matthews with a reasonable alternative - 12 weeks of full-time unpaid leave. This option permitted Village Center to hire another full-time accountant for that 12 week period, to stay on schedule, and to prepare for the upcoming October audit. Although this may not have been Matthews' preferred accommodation, the ADA (and in turn the FCRA) does not require that Village Center accommodate Matthews in any way she sees fit. "The use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to accommodate an employee in any manner in which that employee desires." Stewart, 117 F.3d at 1285 (quoting Lewis v. Zilog, Inc., 908 F.Supp. 931, 947 (N.D.Ga.1995)). This is so because the word "reasonable" would be rendered superfluous in the ADA if employers were required in every instance to provide employees "the maximum accommodation or every conceivable accommodation possible." Id. See also Vande Zande v. State of Wis. Dept. of Admin ., 851 F.Supp. 353, 360 (W.D.Wis.1994) ("an employee is entitled only to a reasonable accommodation and not to [a] preferred accommodation").

"Whether a company will staff itself with part-time workers, full-time workers, or a mix of both is a core management policy with which the ADA was not intended to interfere." Terrell, 132 F.3d at 627. Instead, employers are only required to provide "alternative employment opportunities reasonably available under the employer's existing policies."

36

See School Bd.  Of Nassau County v.  Arline, 480 U.S. 273, 289 n.  19 (1987).  This is exactly what Village Center did - it provided Matthews with the option to take full-time unpaid leave until she could return to work.  That was all that Village Center was required to do.  Summary judgment is due to be granted on this claim.

II.    Matthews' FMLA Claims.

The Family and Medical Leave Act provides employees who have worked for an employer for at least 12 months and at least 1,250 hours, the right to up to 12 weeks of unpaid leave because of a "serious health condition that makes the employee unable to perform the functions of the position of such employee."  See 29 U.S.C. §§ 2611(2)(A); § 2612(a)(1)(D).  An employee who takes leave for a "serious health condition" may do so on an intermittent or reduced leave schedule where medically necessary.  29 U.S.C. § 2612(b)(1); 29 C.F.R. § 825.203.  However, "[a]n employee may not be required to take more leave than necessary to address the circumstance that precipitated the need for leave. . . . " 29 C.F.R. § 825.204(e).

The FMLA also provides such employees with the right, following the completion of leave, "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position.  29 U.S.C. § 2614(a)(1).  The FMLA creates a private right of action to seek equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" these rights.  29 U.S.C. §§ 2615(a)(1); 2617(a); see also Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 724-25 (2003).

In order to protect and enforce these rights, the Eleventh Circuit has recognized two types of claims that may be brought under the FMLA: (1) an interference claim, in which and employee asserts that her employer denied or otherwise interfered with her substantive rights under the Act, see 29 U.S.C. § 2615(a)(1); and (2) a retaliation claim, in which an employee asserts that her employer discriminated against her because she engaged in activity protected by the Act.  See 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c); Hulbert v.  St.  Mary's Health Care System, Inc., 439 F.3d 1286, 1293 (11th Cir.  2006) (citing Strickland v.  Water Works and Sewer Bd.  of the City of Birmingham, 239 F.3d 1199, 1208 (11th Cir.  2001)).

While not entirely clear from her Amended Complaint, it appears that Matthews seeks relief under both theories.  She contends that Village Center interfered with her right to part-time FMLA leave when it forced her to instead take full-time unpaid leave, and that Village Center interfered with her right to reinstatement when it terminated her employment upon her return.  Matthews also contends that her termination was in retaliation for exercising her rights under the Act.  Upon a review of the record, the Court finds that material issues of fact exist such that Matthews' interference claim with respect to her part-time leave request may go forward.  Matthews has not, however, sufficiently established any of her remaining FMLA claims.

**A.    FMLA Interference Claim**

To establish a claim of interference with a substantive right, Matthews need only demonstrate by a preponderance of the evidence that she was entitled to the benefit denied. O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1347, 1353-54 (11th Cir. 2000). There is no dispute that Matthews met the eligibility requirements for FMLA leave, and that she was entitled to both part-time leave and to be reinstated when she returned from her leave. There is also no dispute that Matthews complied with all notice requirements prior to the start of her leave period. Village Center contends, however, that Matthews' claim cannot go forward because she did not suffer from a "serious health condition" at the time she exercised her rights under the Act.[63]

The FMLA defines a "serious health condition" as an illness, injury, impairment or physical or mental condition that involves inpatient care in a hospital or residential medical care facility, or continuing treatment by a health care provider. 29 U.S.C. § 2611(11). At the time Matthews made her claim for FMLA part-time leave, she suffered from a recognized eye disease, but was not hospitalized. Village Center's arguments therefore center on the meaning of "continuing treatment by a health care provider."

The Department of Labor's regulations further define "continuing treatment by a health care provider" as including any of the following conditions:

(a) A period of incapacity of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same

---

[63]The standards for establishing a "serious health condition" are less stringent than those for establishing a "disability" under the ADA. Therefore, Matthews may be able to qualify for FMLA leave while at the same time not qualify for protection under the ADA.

condition, that also involves:

> (1) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

> (2) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

(b) Any period of incapacity due to pregnancy, or for prenatal care.

(c) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

> (1) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

(d) A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

(e) Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy),

kidney disease (dialysis).

29 C.F.R. § 825.114(2).  See also Russell v.  North Broward Hosp., 346 F.3d 1335, 1342

(11th Cir.  2003).  The regulations further define "treatment" to include "examinations to

determine if a serious health condition exists and evaluations of the condition."  29 C.F.R.

§ 825.114(b).

According to Village Center, Matthews did not meet any of the definitions of "serious

health condition."  At the time she requested her part-time FMLA leave, Matthews was not

incapacitated, was able to perform all her job duties, and was not undergoing any

treatments.  The Court disagrees.  Matthews was, in fact, undergoing treatment at the time

she requested her part-time leave.  The Certification form and accompanying documents

from Dr.  Yager expressly state that Matthews was suffering from a "serious health

condition," that she was undergoing periodic evaluation of her kerotoconus, and was being

monitored to ensure that her eyes did not become infected or overly strained.[64]  Dr.  Yager

also stated that he was evaluating Matthews to determine if and when she could start using

contacts in her left eye again, and that she should remain on part-time duty to ease in her

recovery until that determination was made.  Clearly this shows that Matthews was

suffering from a "serious health condition" and qualified for FMLA leave.  It also appears

that Matthews' keratoconus qualifies as a "chronic serious health condition" in that she has

---

[64]See, e.g. Certification of Physician or Practitioner dated June 10, 2004, attached as
Exhibit 17 to Defendant's Motion for Summary Judgment; Letter from Dr.  Jack J.  Yager to Frank
Pfeifenroth, dated June 10, 2004, attached as Exhibit 19 to Defendant's Motion for Summary
Judgment.

suffered from this disease for a prolonged period of time, and her symptoms are more episodic than consistent in nature.[65]

At the very least, Matthews has created a material issue of fact on this point.  On the one hand, her prior physician, Dr. Charles, stated that Matthews had no limitations and did not qualify for FMLA leave.  On the other hand, Dr. Yager stated that she had limitations, and was undergoing continued observation and treatment such that FMLA leave was appropriate.  The conflicting records from her two treating physicians create a credibility issue which is best left for a jury to decide.

Village Center itself has created a fact issue on this point as well.  Village Center previously determined that Matthews was entitled to FMLA leave, based on a review of Dr. Yager's report.  Pfeifenroth approved Matthews' FMLA leave based on Dr. Yager's reports, and Peter Wahl testified at deposition that Matthews was entitled to FMLA leave in 2004.  To now argue that Matthews did not qualify for FMLA leave contradicts the very evidence presented by Village Center and precludes summary judgment.[66]

---

[65]See also 29 C.F.R. § 825.203(c) (noting that intermittent leave or reduced schedule leave may be taken for recovery from treatment or recovery from a serious health condition).

[66]Village Center also contends that Matthews was not qualified for FMLA part-time leave because she could not perform the essential functions of her job while working a part-time schedule.  The two Eighth Circuit Court of Appeals decisions cited by Village Center are neither binding nor persuasive.  See Hatchet v. Philander Smith College, 251 F.3d 670 (8th Cir. 2001); Reynolds v. Phillips & Temro Industries, Inc., 195 F.3d 411 (8th Cir. 1999).  In both decisions, the courts first found that the plaintiffs were not able to perform any of their job duties in any capacity - one decision involved a determination that the plaintiff was not a qualified individual with a disability under the ADA.  As such, both courts determined that awarding a reduced work schedule to a person completely unable to work would be of no effect.  In this case, however,
(continued...)

42

While this ends the analysis of Matthews' interference claim with respect to her requested part-time leave, there is one more step in the analysis of Matthews' right to reinstatement claim.  If an employer can show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable.  <u>Strickland v. Water Works and Sewer Bd.  of the City of Birmingham</u>, 239 F.3d 1199, 1208 (11th Cir. 2001); <u>O'Connor</u>, 200 F.3d at 1354; 29 U.S.C. § 2614(a)(3).  That is exactly the case here.  The evidence is uncontroverted that Village Center terminated Matthews' employment because she moved all of her work-files from her computer to an undisclosed location, without authorization.  There is simply no evidence - circumstantial or otherwise - that her FMLA leave was ever a consideration.  As such, to the extent Matthews has alleged that her termination interfered with her right to reinstatement following FMLA leave, that claim cannot go forward.

## C.    FMLA Retaliation Claim

Matthews also argues that she was fired in retaliation for requesting part-time FMLA leave.[67]  FMLA retaliation claims are assessed under the same framework as Title VII retaliation claims.  <u>Stewart</u>, 117 F.3d at 1287.  However, a plaintiff bringing an FMLA

---

[66](...continued)
Village Center has repeatedly argued that Matthews was not disabled, was able to work a full-time schedule, and was able to perform her essential job functions - a very different situation.

[67]Matthews' retaliation claim centers solely on her termination.  She has not alleged any other adverse employment actions.  <u>See</u> Amended Complaint, ¶¶ 92, 97, 100; Matthews Aff., ¶ 13.  Although Matthews mentions her "forced" full-time FMLA leave in her opposition brief, it appears that she meant to refer to this in her interference claim.

retaliation claim "faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" Strickland, 239 F.3d at 1207 (11th Cir. 2001) (citing King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir.1999)). There is no dispute that Matthews has presented a prima facie case: she engaged in protected activity when she requested part-time FMLA leave; she was fired; and her termination was in close temporal proximity to her request for leave. However, once again, Matthews' retaliation claim fails after the burden shifts to Village Center. Simply put, Village Center had a legitimate non-retaliatory reason for terminating Matthews' employment - her unauthorized destruction and/or removal of company property - and Matthews has failed to present any evidence of retaliatory or discriminatory animus - *i.e.,* pretext. The same discussion and analysis which applies to Matthews' FCRA discrimination and retaliation claims equally applies here. And summary judgment is equally appropriate.

## CONCLUSION

Accordingly, upon due consideration, it is hereby ORDERED and ADJUDGED that the Defendant Village Center Community Development District's Motion for Summary Judgment (Doc. 21) is GRANTED IN PART AND DENIED IN PART. Village Center is entitled to judgment in its favor and against the Plaintiff, Kimbra Matthews on all of the Plaintiff's Florida Civil Rights Act claims (Counts I, II, and III), and the Plaintiff's retaliation claim under the Family and Medical Leave Act (Count V), as set forth in the First Amended

Complaint (Doc. 14).  Village Center is further entitled to judgment in its favor and against the Plaintiff to the extent that the Plaintiff's Family and Medical Leave Act interference claim (Count IV) is based on a right to reinstatement.  The Defendant's motion for summary judgment is denied in all other respects..  The Clerk is directed to withhold the entry of final judgment pending resolution of the remaining claim in this case.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 28th day of November, 2006.

_____

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record